## HOBBS & TUCKER *v.* CHICAGO PACKING AND PROVISION COMPANY.

1. Where the owner of goods shipped them upon a bill of lading whereby they were consigned to his own order, at the same time drawing in favor of a banking partnership " for collection " a draft upon the person to whom the goods were intended to be delivered upon payment of the draft, and also attaching to the draft the bill of lading, so indorsed as to give the partnership control of the possession of the goods, a delivery of them by this firm to the drawee of the draft without requiring its payment was, as against the owner, a conversion subjecting the firm to an action of trover.

2. The rule above announced is not altered by the fact that the owner, not knowing that the goods had already been delivered, agreed to make a like shipment of other goods on condition that the partnership would guarantee the payment of the former draft within a given time, it appearing that the real purpose of this agreement was simply to expedite the delivery of the goods first shipped and the collection of the price of the same.

3. The wrongful delivery of the goods being an act done in a matter within the scope of the partnership business, such delivery, though made or caused to be made by a single member of the firm without the knowledge or consent of the other and only remaining member, rendered the latter liable.

4. The controlling questions in the present case are covered by the foregoing notes.   The evidence warranted the verdict, and there was no error in denying a new trial.

June 12, 1896.   By two Justices.   Argued at the last term.

Trover. Before Judge Bower. Dougherty superior court. April term, 1895.

The Chicago Packing & Provision Co. brought bail-trover against Hobbs & Tucker for certain meat. The defenses were, in brief, that the defendants had committed no tort for which this action would lie, and if they were liable at all, it was only upon a contract of guaranty; and that Hobbs, although a member of the firm of Hobbs & Tucker for the purpose of doing a banking business (collections, deposits, loans, and nothing else), really had no interest in the firm, and had no connection with or knowledge of the transaction involved in this case. The jury found for the plaintiff; and defendants' motion for a new trial was overruled.

It appears from the evidence, that the meat in question was shipped by the plaintiff, upon orders of N. L. Ragan, from Chicago, Ill., to Albany, Ga., on April 11, May 10, and June 3, 1893. To the bills of lading were attached drafts of plaintiff on Ragan, payable to the order of Hobbs & Tucker, for the price of the meat. The bills of lading were issued to plaintiff, contained a direction to notify Ragan, and were indorsed: "Deliver to Hobbs & Tucker, or order, for collection." The drafts with bills of lading attached were forwarded by plaintiff, on making the shipments, to Hobbs & Tucker for collection. The meat was delivered to Ragan by the terminal carrier upon written requests signed by A. W. Tucker (who was the active partner and manager of the firm of Hobbs & Tucker), in which he stated that he would be responsible for the bills of lading. Ragan did not pay for the meat before he got it. The first of the three shipments was subsequently paid for, and the carrier received the bill of lading for it from Ragan. The other two bills of lading and drafts remained in the possession of defendants. Tucker had no dealings individually with plaintiff, but its dealings were with the

firm of Hobbs & Tucker. The following correspondence by mail and telegraph was in evidence:

February 27, 1893, plaintiff wrote to defendants: "We wrote to Mr. Ragan the day before yesterday, explaining fully the reason why we could not ship the last car of ribs ordered. The manner in which Mr. Ragan does business seems to us rather strange. The meat is shipped to our order, and of course cannot be delivered to him until he has taken up the bill of lading. It would seem, therefore, that some of this meat lies a long time on the track, or in some manner in possession of the railroad company. The meat might as well be in our house here as on the track or warehouse in Albany. There are other risks about this manner of doing business, which we have explained to Mr. Ragan, and which we do not feel justified in taking. Mr. Ragan seems to be a man of great energy, and it is very unfortunate that he lacks sufficient capital. We should like very well to do business with him, provided he would take up the draft on arrival of the car of meat. If your firm would guarantee the payment of all drafts in this manner, we would not hesitate to ship as many cars of meat as he might order."

June 1, 1893, Ragan to plaintiff: "Have not been able to discount any paper lately, cause my delay both times; here few days; assist me this time; ship to-morrow," etc.

Same date, defendants to plaintiff: "If you will ship Ragan car meat to-morrow, we will guarantee payment oldest draft on twelve June."

June 2, 1893, plaintiff to defendants: "If guarantee payment of oldest draft on twelfth, and other on twentieth, will ship another car; otherwise will send instructions in reference to taking possession of both cars for our account."

Same date, defendants to plaintiff: "All right; we accept your terms, if ship car ordered to-day."

June 3, 1893, plaintiff to defendants: "We wrote you last night, confirming the telegrams which passed between

us, in which you guarantee the payment of Mr. Ragan's drafts. . . We were rather reluctant to extend the time of payment of these drafts, because we fear that in case of failure, the delay might be hurtful to the meat; and when we come to turn it over to some one else, a complaint might be made to us about its condition. . . "

There was testimony by Tucker, that he always understood the giving of his orders to the carrier to deliver the meat to Ragan, and thought the carrier's agent understood it, to be a personal transaction between them and Ragan; that he gave the orders because the agent declined to accommodate Ragan without some guarantee. The agent testified, that he understood that the orders given by Tucker were binding on the bank, though nothing was said about it; and that if he had thought they bound only Tucker, he would not have let Ragan have the meat. He never had any talk with Hobbs about it, or any business transacted with the bank. In 1892, and soon after Ragan commenced business with the plaintiff, he gave it a bond with his brother as security, for $1,500, conditioned generally to protect plaintiff from losses. Afterwards, a lot of meat having been shipped out, and plaintiff becoming dissatisfied, the bond was increased to $5,000. Ragan generally sold meat in small quantities out of the cars, which would sometimes stay on the track quite awhile. Hobbs & Tucker failed in business on or about June 10, 1893, and the last two bills of lading were turned over to plaintiff's counsel. The meat remaining on hand was taken charge of and sold to persons in Albany by the assistant secretary of plaintiff, who had come to Albany, and who while there stated to a witness that his house had taken a bond from Ragan to indemnify them against loss on account of Ragan not paying for the meat, that it was their understanding with Ragan that he could pay for the meat in ten or fifteen days, so that he could have time to

turn round, and they took the bond to indemnify them against loss while he was making the turn.

W. T. Jones, Wooten & Wooten and J. W. Walters, for plaintiffs in error.  D. H. Pope, contra.

LUMPKIN, Justice.

The material facts are stated by the reporter.

The questions of law involved in this case are indicated by the syllabus.

1. A wrong delivery of goods, either negligently or wilfully made, by one who had been entrusted with the custody of them, is in law a conversion by the latter. This rule has been applied to carriers of goods.  S., F. & W. Ry. Co. v. Sloat Bros., 93 Ga. 803.  In principle, it is alike applicable to the defendants in the present case. There was ample evidence to warrant the jury in finding that the meat of the Chicago Packing & Provision Company was, by its indorsement of the bills of lading, in effect delivered to Hobbs & Tucker, to be by them delivered to Ragan upon his payment for the same, and not otherwise. According to the verdict, the defendants violated the trust reposed in them; and this being so, they ought to make good the loss sustained by the plaintiff on account of their unauthorized and unlawful conduct.

2. There was some evidence tending to show that the plaintiff had accepted a guarantee from Hobbs & Tucker that some of the meat which had already been delivered would be paid for, and that therefore the plaintiff's action should have been brought upon the defendants' breach of contract, and not in tort.  We think, however, that taking the evidence as a whole, it establishes the fact that when this guarantee was accepted, the plaintiff was in utter ignorance of the fact that the meat to the price of which the guarantee related had been actually delivered to Ragan. The plaintiff was evidently under the impression, at the time this guarantee was accepted, that the meat still re-

mained in the cars or in the railroad depot under the control of Hobbs & Tucker; and it is apparent that, in agreeing to ship more meat upon Hobbs & Tucker guaranteeing payment of that already shipped, the plaintiff simply intended to expedite the delivery of the latter and the collection of the money due them for the same, they supposing that Hobbs & Tucker would see to it that Ragan came up with the cash within the time limited in the guarantee, but never contemplating that he should get the meat without paying for it.

3. It seems that the meat was delivered to Ragan upon orders signed by Tucker alone, and it was therefore urged that Hobbs was not liable. Under the facts, the act of Tucker in giving these orders was really an act of the partnership. It was the same, in effect as if he had gone to the station agent and personally directed him to let Ragan have the meat, and it is evident that the agent thus treated and regarded the orders sent by Tucker. It can hardly be doubted that the act of Tucker in causing the delivery to be made to Ragan was within the scope of the partnership business; and consequently, whether it was done with the knowledge and consent of Hobbs or not, he was in law liable. "Each partner being the agent of the firm, the firm is liable for his torts committed within the scope of his agency, on the principle of *respondeat superior*, in the same way that a master is responsible for his servant's torts, and for the same reason [that] the firm is liable for the torts of its agents or servants." 1 Bates' Law of Partnership, §461. "Where one partner, in a matter connected with the business of the partnership, does an act to the injury of a third person, which is a tort by construction or inference of law merely, his copartner is equally liable with him for the consequences of the act." Myers *v.* Gilbert, 18 Ala. 467. See, also, Witcher *v.* Brewer & Michael, 49 Ala. 119. "Partners may be sued in an action of trover, although there was no joint conversion

in fact. A joint conversion may be implied in law by consent of a partner to the acts of his copartners." Bane *et al. v.* Detrick, 52 Ill. 20. "Where a partner, in the course of partnership business, commits a fraud, or does acts prohibited by law, the firm is liable, although the other partners have no knowledge of such fraud or illegal act." Tenney *et al. v.* Foote, 95 Ill. 100. "The appropriation or misapplication by one partner of moneys or other property in the custody of the firm, within the scope of its business, or in the custody of such partner as a representative of the firm, renders each partner liable to the true owner for such conversion; and when thus in the custody of one partner, it is immaterial whether the other partners knew anything about it or not." 17 Am. & Eng. Enc. of Law, 1070. See, also, *Alexander* v. *State,* 56 *Ga.* 478.

4. We find no reason for setting aside the verdict in this case. It was fully warranted by the evidence, and no material error of law was committed on the trial.

*Judgment affirmed.*